MILDRED BENNETT, BY D. B. BENNETT, NEXT FRIEND, RESPONDENT, v.
ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, APPELLANT.*

Springfield Court of Appeals. May 24, 1928.

*Corpus Juris-Cyc References: Carriers, 10CJ, section 1225, p. 792, n. 35; section 1302, p. 863, n. 19; Damages, 17CJ, section 153, p. 834, n. 69.

*E. T. Miller* and *Ward & Reeves* for appellant.

*Phillips & Fulbright* for respondent.

BRADLEY, J.—This is an action for damages alleged to have resulted from inhuman conduct on the part of defendant's conductor towards plaintiff. The cause was tried to a jury. Judgment went against defendant and this appeal followed. At a previous term we handed down an opinion in this cause, but granted a rehearing and the cause was reargued.

It is alleged that on August 16, 1925, plaintiff, purchased a ticket of defendant's agent at Zalma, Missouri, entitling her to transportation on defendant's passenger train from Zalma to Poplar Bluff, Missouri; that she boarded defendant's passenger train running from Zalma to Poplar Bluff and thereafter delivered her ticket to the con-

ductor, and that thereupon the conductor wrongfully, falsely, negligently, wantonly and maliciously told plaintiff that she would have to change cars at Puxico, Missouri, in order to get to Poplar Bluff and that relying upon said information and being deceived thereby, and unaware of its falsity, she got off the train at Puxico; that thereafter the agents of defendant permitted her to board another train of defendant at Puxico without ascertaining her destination, and that she boarded said last-mentioned train under the impression that it would take her to Poplar Bluff; that thereafter, and after said train had proceeded beyond the station of Mingo, the conductor inquired of plaintiff her destination, and that she told him it was Poplar Bluff; that the conductor told her that she was on the wrong train, and thereupon negligently, wrongfully and maliciously stopped said train and put her off into a heavy rainstorm and told her to walk back to Mingo.

Plaintiff further alleges that she is and was lame and unable to walk for any great distance without suffering physical pain and mental anguish, which fact was known to the conductor, or could have been known by him by exercising due care; that upon being put off said train she started to walk back in said rainstorm towards Mingo; that she was unacquainted with any person at Mingo and had no funds to pay her expenses or to communicate with her father and mother, and that, on account of her crippled condition, she was unable to walk from Mingo to Poplar Bluff; that she went to the house of parties living near the railroad and that they took her in and protected her from the storm; that there was no other train on defendant's railroad going from Mingo to Poplar Bluff until twenty-four hours later.

Plaintiff alleges further that by reason of the alleged wrongful conduct of defendant's agents she was caused to suffer great physical pain, fear, humiliation and mental anguish; that by reason of being drenched in said rain she contracted a cold which caused her physical suffering and mental anguish. The prayer asked for $5000 actual and $5000 punitive damages.

The answer is a general denial. The verdict was for $1000 actual damages.

Error is assigned (1) on the refusal of an instruction in the nature of a demurrer to the evidence at the close of the case; (2) on the admission of evidence; (3) on instructions given and refused; and (4) on an alleged excessive verdict.

Plaintiff testified that she was fourteen years old on August 17, 1925; that on August 16, 1925, she went to defendant's station at Zalma and purchased a ticket to Poplar Bluff; that she did not know how the trains ran between Zalma and Poplar Bluff; that when she got on the train she gave her ticket to the conductor and that he gave her a hat check and put it in the window curtain by her; that the

conductor told her she would have to change trains at Puxico; that there would be another train, waiting at Puxico that would take her to Poplar Bluff; that the brakeman came and told her when she got to Puxico; that when the train arrived at Puxico it was raining "awful hard," and that she got off the train and on another "that was waiting there;" that some other passengers did likewise; that he (presumably the brakeman) handed her the hat check from the window before she got off; that she got off at the back end of the train, but did not see the conductor or brakeman when she got off; that she thought the train she boarded at Puxico was going to Poplar Bluff; that the brakeman helped her to board the train at Puxico; that at that time she did not know where Mingo was; that in ten or fifteen minutes after she boarded the train at Puxico, and after the train. had passed Mingo, the conductor came to her and asked her where she was going and that she told him she was going to Poplar Bluff, and that he told her she was on the wrong train and "would have to get off that train;" that she told the conductor she was on the train "they told me to get on," and that the conductor said, "I can't help it, you are on the wrong train;" that the conductor "stopped the train and helped me off and pointed to the station right down there and told me I could go back down there to the station. I had a bundle with me, but no umbrella."

Plaintiff further testified that when she got off the train it was raining; that she was so crippled at that time with infantile paralysis in the left leg that she could not get her heel to the floor; and that she did not know where she was; that she could not see the station of Mingo because of an embankment and a curve in the railroad; that she went to a house, but found no one there, and that she then went to Mrs. Richards' house and asked her when there would be a train to Poplar Bluff and was informed that there would not be a train to Poplar Bluff until eight o'clock next morning; that Mrs. Richards took her in and that she dried her clothes by the kitchen stove, and stayed there all day. Plaintiff further testified that she was nervous, scared and trembled; that she had gotten cold from the rain, had fever, and that on that day she contracted a cold and that her knees cramped and that she felt "awful bad." Other witnesses testified on behalf of plaintiff and corroborated her in some matters, but, for the purposes of what we may term the demurrer, it is not necessary to detail their evidence.

It was about nine o'clock in the morning when plaintiff went to Mrs. Richards' house, and she remained there until her folks came from Poplar Bluff that night in response to a message sent collect.

Defendant's evidence, so far as pertinent to the assignment on the sufficiency of the evidence, was in substance as follows:

L. E. Wright, the conductor of the train which plaintiff boarded at Zalma, testified that on the occasion in question he had an extra

car which was usually carried on Sundays and was always set out at Puxico; that plaintiff was riding in this extra coach, which was the rear coach of the train; that before reaching Puxico he announced to the passengers, including plaintiff, that those desiring to go to Poplar Bluff should go into the next coach, as the rear coach would be set out at Puxico; that he told plaintiff she would have to go into the car ahead at Puxico and that he pointed out the other coach to her; that he had no reason for telling plaintiff or anyone else to get off the train if they were going to Poplar Bluff, but they had to change cars or coaches by going into the coach ahead because the rear coach was to be set out at Puxico; that he did not see plaintiff get off the train at Puxico and he did not notice that she was crippled; that he saw her while she was sitting in the coach and never saw her on her feet, and when the train stopped at Puxico he went into the station to get his orders, as he always did; that after he had started on to Poplar Bluff with his train he discovered that plaintiff was not on the train and that he sent a message back to the agent at Puxico and advised him that a girl had gotten off at Puxico; that he did this so the agent at Puxico could take care of her; that he did not use any abusive language towards plaintiff; and had no illwill or illfeeling towards her; that he told each passenger personally in the rear coach who had a ticket for Poplar Bluff that they would have to go into the car ahead at Puxico; that it is about twenty-two miles from Zalma to Puxico, and about twenty miles from Puxico to Poplar Bluff, and three miles from Puxico to Mingo; that Mingo is towards Poplar Bluff from Puxico and is on the same line of railroad that Puxico and Poplar Bluff are on; that Mingo is the junction point of the Cape Girardeau-Hoxie road, and the Willow Springs branch; that the train plaintiff was on when she got to Puxico went on to Poplar Bluff, and the train she got on by mistake at Puxico took the Williow Springs branch at Mingo and went on through Williamsville to Willow Springs; that the Willow Springs branch of the Frisco crosses the Missouri Pacific at Williamsville, and that it is about twenty miles over the Missouri Pacific from Williamsvil'e to Poplar Bluff.

Arthur Steck, the brakeman on the train which plaintiff boarded at Zalma, testified that the train at this time carried an extra car on Saturdays and Sundays on account of the increase of business on those days; that immediately before the train got to the station of Puxico he announced the station and announced the change for Williamsville. Hunter, etc.; that he did not give any directions about any change of trains for the passengers going to Poplar Bluff; that he did not remember whether it was raining when the train reached Puxico or not, and he did not remember seeing plaintiff at Puxico and if he did see her he did not notice her crippled condition.

F. F. Muir testified that he was conductor on the train which plaintiff boarded by mistake at Puxico; that he did not see plaintiff when she boarded the train at Puxico and the first he saw of her was just after the train had pulled out of Mingo; that plaintiff then gave him her hat check and he thereupon asked her where she was going and she said she was going to Poplar Bluff; that he then told her that she was on the wrong train, that the only way to get to Poplar Bluff then was to go on to Williamsville; that plaintiff told him she did not desire to go to Williamsville, and that he then told her she would have to go back to Mingo and tell her troubles to the agent; that she then didn't say a word; that he did not advise her to get off the train, nor did he put her off the train; that it was twenty-four miles from Mingo to Williamsville, and about twenty miles from Williamsville to Poplar Bluff over the Missouri Pacific; that there was nothing in the conversation between him and plaintiff about her not having the money to pay her fare; that he did not know she was a cripple and did not discover that she was on that occasion, that he had no illwill against the plaintiff and did not use any bad language or insulting words towards her; that the agent lived in the depot at Mingo at that time, and when plaintiff got off the train she started towards the depot in the direction he had pointed out to her; that he did not try to get any information from her as to why she had gotten on that train, but as soon as he learned she was on the wrong train he suggested to her that she go on to Williamsville and go from there on the Missouri Pacific to Poplar Bluff, but she did not want to do that, and he stopped the train and let her off.

C. R. Holloway testified that he was brakeman on the train that plaintiff got on at Puxico by mistake, and at the time his train was boarded by the passengers at Puxico there were light showers of rain; that he did not remember seeing plaintiff get on the train at all, and did not notice any girl getting on who was crippled; that he did not require the passengers to show their tickets or checks before getting on the train because it was raining and he let them get on without showing them; that after the train stopped to let plaintiff off about a quarter of a mile from Mingo he was at the rear end of the train and helped plaintiff off the rear coach; that it was raining some at that time; that he did not notice plaintiff was crippled and she said nothing about being crippled; that he had no conversation whatever with plaintiff; that the conductor walked back to the rear of the coach with plaintiff and announced to witness that he had a passenger for Poplar Bluff, and witness knew it was his duty to help her off the train, which he did, although she said nothing to him, and he had no conversation whatever with her; that he merely said to the plaintiff after she had stepped down on the ground, that the depot was right around the curve and that she started walking back that way.

Plaintiff denied that conductor Muir told her that she could go on to Williamsville and from there to Poplar Bluff on the Missouri Pacific.

Plaintiff's case was submitted on the theory that she boarded the train at Puxico by her own mistake, and that the conduct of defendant's conductor in thereafter putting her off the train was inhuman as appears from the main instruction which is as follows: "The court instructs the jury that if you find and believe from the evidence that plaintiff purchased a ticket from Zalma to Poplar Bluff and on her journey between said points, through mistake, at Puxico, Missouri, boarded a passenger train of the defendant, the destination of which was Willow Springs, Missouri, and that after said train had proceeded beyond the station of Mingo, that the employees of defendant in charge thereof, upon learning that plaintiff was intending to go to Poplar Bluff, thereupon stopped said train and negligently put plaintiff off of said train and into the rain, and if you further find that such conduct on the part of defendant's agents was wilful and inhuman and as a direct result thereof, and through no fault on the part of the plaintiff, she suffered the physical injuries, if any, described in evidence, or suffered the fright and mental anguish, if any, described in evidence, then and in that event your verdict will be for the plaintiff."

In Noble Rawlings v. Wabash Ry. Co., 97 Mo. App. 515, 71 S. W. 534, plaintiff was a boy about four years old. He and his sister, twelve years old, were put on the train by their father at Columbia, Missouri, to go to More's station about a mile distant. The sister had a ticket, but the boy did not. The sister gave the conductor her ticket before the train arrived at More's station. The train did not stop at this station, but went past the same about 250 yards where the plaintiff was, without injury, put off together with his sister. He and his sister walked back to the station and in doing so passed over a cattle guard. The walk back was muddy and slippery. It was so dark when they arrived at the station that their mother could not recognize them at a short distance. On the walk back the boy fell down, got muddy and was greatly scared; had to have medical attention; and eight o'clock that night was in bed with a high fever.

It was held that plaintiff could not recover. It was also held that the plaintiff was a passenger within the meaning of the law. The trial court found that putting plaintiff off the train under the facts disclosed "was not characterized by malice, insult or inhumanity" and the result reached on appeal affirmed this finding. And it was held as stated in the second headnote to the opinion as reported in 98 Mo. App. 515, that "a person carried by his station may recover for inconvenience, loss of time and labor, and necessary expense, but not for anxiety of mind nor effect upon health, such as

sickness." [See, also, Strange v. Mo. Pac. Ry. Co., 61 Mo. App. 586; Deming v. C., R. I. & P. Ry. Co., 80 Mo. App. 152; Snyder v. Wabash Ry. Co., 85 Mo. App. 495.]

Bessie Rawlings v. Wabash Ry. Co., 97 Mo. App. 511, 71 S. W. 535, was a companion case to the Noble Rawlings case. Bessie, on her walk back to the station in company with her brother, Noble, fell between the triangular bars of a cattle guard which she was compelled to cross and received physical injuries. It was held that Bessie could recover. The theory upon which recovery was permitted as stated in the opinion was as follows: "The defendant argues that the plaintiff in no event is entitled to recover more than nominal damages, but this we are unwilling to concede. The general rule announced and prevailing in this State is that pain of mind—injured feelings—when connected with bodily injury is the subject of damages, but must be connected in order to be included in the estimate unless the injury is accompanied by circumstances of malice, insult or inhumanity. In the present case it does not seem that the injury was accompanied with circumstances of malice, insult or inhumanity, but it cannot be said that there was no evidence that the plaintiff's injured feelings were connected with bodily injury."

The rule that recovery will not be allowed for mental worry or injury when not connected with physical injury is again announced and affirmed in Perkins v. Wilcox, 294 Mo. 700, 242 S. W. 974; Porter v. St. Joseph Ry. Light, Heat & Power Co., 277 S. W. (Mo. Sup.) 913; and McCordle v. Peck Dry Goods Co., 271 Mo. 111, 195 S. W. 1034.

The cause at bar was submitted on the theory that the act of the conductor in putting plaintiff off the train was inhuman, and not upon the theory of a breach of contract. This clearly appears in plaintiff's insturction set out, supra. Under the theory upon which the cause at bar was submitted if the conduct of defendant's conductor in putting plaintiff off the train was not inhuman then she cannot recover. Plaintiff relies principally upon Harless v. Southwest Missouri Elec. Ry. Co., 123 Mo. App. 22, 99 S. W. 793, to support the contention that the conduct of the conductor was inhuman. Dicey Harless was six years old. Her cousin, a young woman, put her on one of defendant's interurban cars, in charge of the conductor, at 9th and Mineral streets in Galena, Kansas. The young lady told the conductor to put Dicey on a connecting car in Joplin, Missouri, for Smelter Hill in Joplin and pinned a memoranda to that effect on Dicey's dress. This was between three and four o'clock P. M. on January 29th, a very cold day, the thermometer registering about ten degrees above zero, with a cold wind blowing and ice and snow on the ground. The young woman thought Dicey had a five cent piece for her fare, but Dicey had no money for fare. When the car had proceeded to the outskirts of Galena, where houses were

few and none occupied for a block or more, the conductor put her off and left her by the side of the track. He looked back and saw her following after the car instead of going back in the direction where she was put aboard. The conductor went on to a passing point, not very far distant, and there told the conductor of a passing westbound car that if he saw Dicey he had better pick her up and take her back to 9th street. The conductor of the westbound car met Dicey and took her aboard. She was very cold and frightened. Two women passengers· took her in charge. They got off with her at 12th street and took her into a meat market. She tried to tell her name, but was too frightened to tell anything, but did give those in charge of her the note on her dress which told who she was and where going. A man standing by was going to Joplin and agreed to take Dicey home. This man in due time delivered Dicey to her father in Joplin.

On these facts it was held that the conductor's conduct was inhuman. But manifestly the facts of the Harless case are much stronger than are the facts of the instant case. We do not think that the facts at bar are any stronger on the question or point on inhuman conduct than are the facts of the Rawlings cases, supra. In the Noble Rawlings case the plaintiff was only four years old and his sister twelve. In the Noble Rawlings case it would appear that the issue on whether the conduct of the conductor was inhuman was considered as one of fact, but as we read the Bessie Rawlings case it was held that the conduct of the conductor was not inhuman, but that plaintiff could recover because of a *breach* of contract *and* because she received a physical injury in walking back to the station. The Rawlings children were put off 250 yards beyond the station and when it was practically night. In the cause at bar plaintiff was put off a quarter of a mile from the station, but it was in the daytime and on a warm day and was only 220 yards to a house where plaintiff found shelter. It is true that it was raining some when plaintiff was put off, but but there was no evidence of any storm. The act of the conductor in putting plaintiff off the train is not, under the circumstances to be commended, but in the light of the Rawlings case we are constrained to hold that his conduct "was not characterized by malice, insult or inhumanity."

As stated plaintiff's case was submitted on the theory that the conductor's conduct was inhuman. According to the law as we understand it, and under the facts, the conductor's conduct in putting plaintiff off the train was not characterized by malice, insult or inhumanity. If such was not the case then plaintiff cannot recover. There was no breach of any contractual relation such as was the case in the Bessie Rawlings case and in Davis v. Lusk, 190 S. W. (Mo. App.) 362, and many other similar cases relied upon by plaintiff. As the cause was submitted and as the jury found plaintiff was brought to her predicament because of her own mistake in

boarding the wrong train, therefore, the defendant was not negligent respecting plaintiff's boarding and being on the wrong train. Her case as it went to the jury depended on the alleged inhuman conduct of the conductor in putting her off under the circumstances above detailed.

It was about 220 yards from where plaintiff was put off the train to Mrs. Richard's house. Plaintiff says that she walked this distance pretty fast; that the day was warm and that it was raining; that the rain made her cold; that she did not have a doctor; that she did not have a cough until she got wet, and that she began coughing while walking from where she left the train to Mrs. Richards' house; that Mrs. Richards told her she had fever. At noon that day Mrs. Richards and plaintiff walked in a light rain to the station where plaintiff sent the message to her folks. Plaintiff went with Mrs. Richards to church at Puxico that night before her folks came for her. Plaintiff testified that she was frightened because she did not know anybody; that it took her about fifteen minutes to walk from the point where she was put off to Mrs. Richards' house and during "that fifteen minutes I developed this cough and fever." In a few days after plaintiff's return home she wrote a letter which was in evidence. Plaintiff stated that she wrote this letter in about three days after she returned from Zalma and that "when I wrote that letter I had entirely recovered from this exposure of getting off the train in the rain."

The evidence tends to show that plaintiff may have contracted a slight cold because of her experience, but if defendant was not legally at fault and breached no legal duty that it owed plaintiff then it is not liable for any injury or damage resulting. [Crutcher v. Railroad, 132 Mo. App. 311, 111 S. W. 891; Rawlings v. Railroad, 97 Mo. App. 515, 71 S. W. 534.]

We have given this cause most careful consideration and it is our opinion that plaintiff, under the facts and the law, cannot recover, hence it is not necessary to consider assignments other than the demurrer. The judgment should be reversed and it is so ordered. *Cox, P. J.*, and *Bailey, J.*, concur.